IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Criminal Action No. 05-111 JJF |
| | : | |
| KATSIARYNA KABIARETS, | : | |
| | : | |
| Defendant. | : | |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF PRETRIAL MOTION
TO SUPPRESS STATEMENTS AND PHYSICAL EVIDENCE**

Defendant, Katsiaryna Kabiarets, by and through her undersigned counsel, Christopher S. Koyste, respectfully submits this Memorandum of Law in support of her Pretrial Motion To Suppress Statements and Physical Evidence. For the reasons set forth below, Ms. Kabiarets seeks to exclude the Government's admission, at trial, of any and all statements and evidence that were obtained in violation of her Fifth Amendment rights.

**I.    INTRODUCTION**

On November 18, 2005, Ms. Kabiarets was arrested and charged with Credit Card Fraud Conspiracy, in violation of 18 U.S.C. § 1028(b)(2); Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A; and Identity Theft, in violation of 18 U.S.C. § 1028(a)(7). On March 17, 2006, Ms. Kabiarets filed a Motion to Suppress Statements and Physical Evidence. The grounds for Ms. Kabiarets' motion related to two custodial interrogations. The first interrogation was conducted at Ms. Kabiarets' workplace on November 16, 2005, and the second interrogation was conducted at the

Secret Service office in Wilmington, Delaware on November 18, 2005. On May 9, 2007, the Court conducted a hearing to determine Ms. Kabiarets' motion.

Ms. Kabiarets contends that any statements made during both interrogations were obtained in violation of her Fifth Amendments rights. Therefore, any statements made by Ms. Kabiarets, as well as any derivative evidence obtained after those involuntary statements, must be suppressed pursuant to Miranda v. Arizona, 384 U.S. 436 (1966).

## II.  FACTUAL BACKGROUND

In November 2005, the United States Secret Service began an investigation into credit card fraud stemming, in part, from credit card numbers that had been compromised at Harpoon Hanna's restaurant in Fenwick Island, Delaware. Tr. at 5. During the course of this investigation, American Express informed Special Agent Michael Armstrong that roughly 99% of the compromised numbers were traced to an employee number that was assigned to Ms. Kabiarets. Tr. at 5.

Special Agent Armstrong contacted Immigration and Customs Enforcement regarding Ms. Kabiarets' status. Tr. at 6. After determining that Ms. Kabiarets was on a student work visa, Special Agent Armstrong, along with Special Agent Lassiter, went to Harpoon Hanna's to question Ms. Kabiarets. Tr. at 6.

### A. November 16, 2005 Custodial Interrogation

According to Special Agent Armstrong, American Express had previously contacted restaurant management regarding the investigation. Tr. at 7. Upon arrival at Harpoon Hanna's, Special Agents Armstrong and Lassiter spoke with a member of restaurant management in connection

with their investigation, and requested that the manager summon Ms. Kabiarets for questioning. Tr. at 7-9.

After Ms. Kabiarets arrived, the special agents presented their credentials and moved her to a booth in the back corner of the restaurant. Tr. at 9. During this period, the restaurant was not open for business, and the special agents did not inform Ms. Kabiarets that she was free to leave or had the right to remain silent. Tr. at 8, 49.

Instead, the special agents initiated questioning by asking Ms. Kabiarets about her arrival in the United States and living situation. Tr. at 10-11. The special agents then explained to Ms. Kabiarets that they were investigating credit card fraud and knew that 99% of the compromised numbers were traced to her through her employee number. Tr. at 12, 49. According to Special Agent Armstrong, the special agents suspected that Ms. Kabiarets had or used a skimming device, and a goal of the interrogation was to gain her cooperation with the Secret Service investigation. Tr. at 50.

The special agents alleged that they produced a standardized Secret Service <u>Miranda</u> warning form, which contained the <u>Miranda</u> warnings, an acknowledgment that the warnings had been read aloud, and waivers of the <u>Miranda</u> rights to silence and counsel. The form was signed by Ms. Kabiarets and Special Agent Armstrong. Tr. at 14-18.

After the form had been signed, the special agents resumed questioning Ms. Kabiarets about their investigation. At some point during the interrogation, Special Agent Lassiter confiscated Ms. Kabiarets' cell phone and she made self-incriminating statements, which were eventually memorialized on another Secret Service form that was signed by Ms. Kabiarets and Special Agent Lassiter. Tr. 19-23. The entire interrogation lasted for approximately one hour. Tr. at 18, 64-65. After the

3

interrogation, the special agents asked Ms. Kabiarets for permission to search her car, and obtained her signature on a Secret Service Consent form. Tr. at 24. Special Agent Lassiter searched Ms. Kabiarets' car, which was located in the Harpoon Hanna's parking lot. Tr. at 26-29. During this search, Ms. Kabiarets asked for, and received, permission from Special Agent Armstrong to use the restroom. Tr. 28-29. Special Agent Armstrong followed Ms. Kabiarets into the restaurant, and was approached by a manager who informed him that Ms. Kabiarets had just put something on a shelf in a coat closet. Tr. at 29. This item, later determined to be a credit card "skimmer," was subsequently recovered by the Secret Service. Tr. at 29, 31, 33.

The special agents subsequently asked for consent to search Ms. Kabiarets' residence in Ocean City, MD. Tr. at 31. Ms. Kabiarets agreed, and was accompanied in her car by Special Agent Lassiter. Tr. at 34. Special Agent Armstrong followed in another vehicle. Tr. at 34.

Upon arrival at Ms. Kabiarets' residence, the special agents obtained signed Secret Service Consent forms from Ms. Kabiarets and Tigran Melkumyan, her boyfriend, who also lived at the residence. Tr. at 33. The special agents seized two computers, and left Ms. Kabiarets at her home. Tr. at 34.

### B. November 18, 2005 Custodial Interrogation

After the residential search, Ms. Kabiarets and Mr. Melkumyan contacted Secret Service to inquire about the return of their computers and Ms. Kabiarets' cell phone. Tr. at 67. In response, Special Agent Armstrong told Ms. Kabiarets to come to the Secret Service office in Wilmington on November 18, 2005, but never informed her that she would be further questioned about the investigation at that time. Tr. at 67-68. Upon arrival, Ms. Kabiarets was searched pursuant to office

policy and taken to a conference room. Tr. at 43. Ms. Kabiarets was again questioned, this time by Special Agent Armstrong and Special Agent Michele Moorehead. Tr. at 41, 69-70.

Ms. Kabiarets signed a Secret Service <u>Miranda</u> and Waiver form, and was questioned for approximately one hour. During this time, she again made self-incriminating statements. Tr. at 36-37, 39-40, 41, 39. The Special Agents memorialized her statements on a Secret Service form, and arrested her. Tr. 39-40, 42.

## II. DISCUSSION

### A. Ms. Kabiarets' Statements Were Obtained In Violation of Her Fifth Amendment Rights And Must Be Suppressed Pursuant To Miranda v. Arizona.

The Fifth Amendment of the United States Constitution protects a citizen from being "compelled in any criminal case to be a witness against himself." US CONST. Amend. V; <u>see also</u> <u>United States v. DeSumma</u>, 272 F.3d 176 (3d Cir. 2001) (noting that the Fifth Amendment bars the prosecution from using compelled testimony in its case in chief because the failure to administer <u>Miranda</u> warnings creates a presumption of compulsion, and even unwarned, voluntary statements are excluded from evidence). In <u>Miranda</u>, the Supreme Court defined custodial interrogation as "questioning by law enforcement officers after a person has been taken into custody or deprived of his freedom of action in any significant way." <u>Id.</u> at 444.

The Court premised this rule on the proposition that custodial interrogation is inherently coercive, and individuals subject to that form of questioning must be independently protected against intrusions on their rights. <u>Id.</u> at 533; <u>see</u> <u>also</u> <u>Rhode Island v. Innis</u>, 446 U.S. at 301 ("[T]he term 'interrogation' under <u>Miranda</u> refers not only to express questioning, but also to any words or actions

on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.").

"In determining whether an individual [is] in custody, a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint in freedom of movement' of the degree associated with a formal arrest.'" Stansbury v. California, 511 U.S. 318 (1994) (quoting California v. Beheler, 463 U.S. 1121 (1983)) (stating that the initial determination of custody depends on objective circumstances and not, on the subjective views of the interrogating officers or the person being questioned); see also Berkemer v. McCarty, 468 U.S. 420 (1984) (stating that the relevant inquiry is how a reasonable person in the suspect's position would have understood his situation); Rhode Island v. Innis, 446 U.S. at 300-01 (1980) (". . . Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent."); United States v. Jacobs, 431 F.3d 99 (3d Cir. 2005) (stating that if Miranda warnings are not given before a person is in custody, evidence resulting from the questioning must be suppressed).

In Jacobs, the Third Circuit explained that:

[T]here are at least three differently worded tests for when a person is in custody: (1) when the person has been deprived of her or his freedom in some significant way; (2) when a reasonable person would perceive that she or he was not at liberty to terminate the interrogation and leave; and (3) when there is a restraint on the person's freedom of movement of the degree associated with a formal arrest.

Id. at 105. The Court further noted that three factors should be weighed to determine if an individual is in custody:

One is the location of the questioning. We have stated that 'all 'station house'

interrogations should be scrutinized with extreme care for any taint of psychological compulsion or intimidation because such pressure is most apt to exist while a defendant is interviewed at a police station. A second factor is the information known by the officer concerning the suspect's culpability. 'The more cause for believing the suspect committed the crime, the greater tendency to bear down in interrogation and create the kind of atmosphere of significant restraint that triggers Miranda and vice versa.' And a third factor is whether the officer revealed his or her belief that the suspect was guilty.

Id. at 105 (quoting Stansbury v. California, 511 U.S. at 325 ("An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned."); see also United States v. Willaman, 437 F.3d 354, 359-60 (3d Cir. 2006) (identifying the additional factors of the length of the interrogation, whether the officers used coercive tactics such as hostile tones of voice, the display of weapons and whether the suspect voluntarily submitted to questioning); Missouri v. Seibert, 542 U.S. 600, 609 (2004) (addressing the police tactic of beginning custodial interrogations without Miranda warnings, and then providing the warnings mid-stream to effectuate a waiver of rights, and stating that "failure to give the prescribed [Miranda] warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained." ).

Thus, in order to obtain legally admissible statements during custodial interrogation, the interrogating officers must apprise the party subject to questioning of the Miranda rights to counsel and silence, and secure a waiver of those rights before continuing questioning. Id. This waiver must be given "voluntarily, knowingly and intelligently," and the government bears the burden of proving compliance with the procedural safeguards. Id. at 444; see also, Frazier v. Cupp, 394 U.S. 731, 739 (1969) (stating that courts must examine the totality of the circumstances to determine the voluntariness of self-incriminating statements).

Here, Ms. Kabiarets was in custody during both interrogations. During the first interrogation, the special agents summoned Ms. Kabiarets and informed her that they were investigating credit card fraud and knew that her employee number had been used in 99% of the fraud situations. The special agents, who believed at the beginning of the interrogation that Ms. Kabiarets has used a skimmer and wanted her cooperation, did not inform her that she was free to leave and did not have to answer any questions. Additionally, during the post-warning phase, agents confiscated Ms. Kabiarets' cell phone and searched her car, and she was continuously accompanied by a special agent during a trip to the restroom and the drive to her home. Tr. at 60, 63.

During the second interrogation, special agents summoned Ms. Kabiarets to their offices under the pretext of retrieving her computers and cell phone. Ms. Kabiarets, however, was again questioned by agents regarding the investigation and evidence against her, and ultimately arrested.

At the beginning of both interrogations, the agents should have administered Miranda warnings.[1] In both situations, the atmosphere was such that a reasonable person would not have felt

---

[1] Ms. Kabiarets further notes that, although the agents administered Miranda warnings during the first interrogation, this warning does not carry over to any initial, pre-warning statements during the second interrogation. See e.g., United States v. Smith, 679 F.Supp. 410 (D. Del. 1988) (noting United States v. Hopkins, 433 F.2d 1041 (5th Cir. 1970), which observed that 'Miranda warnings, once given, are not to be accorded unlimited efficacy or perpetuity.'") (citation omitted). In Smith, the court explained that the determination of whether a subject has waived his or her Miranda rights must be examined under a totality of the circumstances. The court further noted, by survey of case law, factors for consideration, such as appreciable time gaps, the moving of the suspect, intervening events and the suspect's knowledge or conduct. Id. at 412. Finally, the court cautioned law enforcement officials that "earlier warnings could be found ineffective or intervening events could invalidate them [and][,] [l]aw enforcement officials can quickly and easily reiterate the warnings and avoid these risks." Id. at 413.

Here, considering a totality of the circumstances, the agents should have administered Miranda warnings at the beginning of the second interrogation and prior to questioning Ms. Kabiarets. Ms. Kabiarets had previously been questioned, and special agents had searched her car

free to terminate the investigation and leave. Indeed, the special agents' conduct created an atmosphere of pressure that compelled responses to their questions, and both interrogations demonstrate a pattern of question first, and warn mid-stream, to effectuate a waiver of Ms. Kabiarets' rights. Such police tactics, however, undermine the voluntariness of Ms. Kabiarets' statements and waiver, and any self-incriminating statements that were made in violation of her Fifth Amendment rights must be suppressed. Miranda, 384 U.S. at 436.

### B. The Skimmer, Which Was Obtained After A Violation Of Ms. Kabiarets' Miranda Rights, Must Be Suppressed.

Generally, evidence obtained as a result of a constitutional violation is suppressed because it is "fruit of the poisonous tree." Oregon v. Elstad, 470 U.S. 298 (1985). Although the Supreme Court has determined that the failure to give a suspect Miranda warnings does not require suppression of the physical fruits of a suspect's statements, such physical evidence may be suppressed if the statements were involuntary and unconstitutional under the Fifth Amendment. United States v. Patane, 542 U.S. 630 (2004). Thus, in the context of Fifth Amendment violations, "coercive police activity is a necessary predicate to the finding that a [statement] is not 'voluntary.'" Colorado v. Connelly, 479 U.S. 157, 167 (1986).

---

and residence. Moreover, there was a two-day time lapse between interrogations, which were conducted in different locations, and Ms. Kabiarets arrived at Secret Service offices under the pretext of retrieving her personal items. These events invalidate the prior Miranda warnings from the first interrogation, and a reasonable person would not have understood that he or she retained a choice about continuing to talk to the special agents. See e.g., United States v. Naranjo, 426 F.3d 221 (3d Cir. 2005). Accordingly, the officers should have administered Miranda warnings prior to questioning at the second interrogation.

Here, as previously argued, the circumstances demonstrate that Ms. Kabiarets, who believed that she was not free to leave or to terminate the interrogations, made involuntary statements based on the special agents' conduct. Notably, the existence of the skimmer was discovered when Ms. Kabiarets was followed to the restroom by one of the special agents, who admitted that there was no valid law enforcement reason for his decision to follow her. Thus, the evidence of the skimmer must be suppressed because it was discovered as a result of the violation of Ms. Kabiarets' Fifth Amendment rights.

### III. CONCLUSION

The Court should exclude any and all statements and physical evidence that were obtained after law enforcement officials violated Ms. Kabiarets' Fifth Amendment rights. See Miranda v. Arizona, 384 U.S. at 436. The special agents' questioning during both interrogations created an atmosphere that compelled her statements, and demonstrates a pattern of question first, and warn mid-stream, to effectuate a waiver of Ms. Kabiarets' rights. Such police tactics, however, undermine the voluntariness of Ms. Kabiarets' statements and waiver, and any self-incriminating statements that were made during the interrogations were obtained in violation of her Fifth Amendment rights. Moreover, all derivative evidence obtained in violation of Ms. Kabiarets' Fifth Amendment rights must be suppressed. See United States v. Patane, 542 U.S. at 630.

Accordingly, this Court should exclude any and all statements and physical evidence obtained as the result of the violation of Ms. Kabiarets' Fifth Amendment rights.

    /s/ Christopher S. Koyste
Christopher S. Koyste, Esquire
Assistant Federal Public Defender

Tieffa N. Harper, Esquire
Research & Writing Attorney

Attorneys for Katsiaryna Kabiarets

FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF DELAWARE
ONE CUSTOMS HOUSE
704 KING STREET, SUITE 110
WILMINGTON, DE 19801
(302) 573-6010

Dated: May 25, 2007