IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| Plaintiff, | : |
| | : Criminal Action No. 05-111 JJF |
| KATSIARYNA KABIARETS | : |
| Defendant. | : |

## GOVERNMENT'S POST-HEARING RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS STATEMENTS AND PHYSICAL EVIDENCE

**COMES NOW** the United States of America, by and through its attorneys, Colm F. Connolly, United States Attorney for the District of Delaware, and Douglas E. McCann, Assistant United States Attorney for the District of Delaware, and hereby responds post-hearing to defendant Katsiaryna Kabiarets' Motion to Suppress Statements and Evidence as follows:

### **PROCEDURAL HISTORY**

The defendant was indicted on December 15, 2005 for conspiracy to commit credit card fraud, aggravated identity theft, and identity theft. On March 17, 2006, the defendant filed the instant Motion. After a number of continuances requested by the parties, the Court held an evidentiary hearing on May 9, 2007.

### **FACTS**

In November, 2005, the United States Secret Service was contacted by American Express about credit cards being compromised at Harpoon Hanna's, a restaurant located in Fenwick,

Delaware. Tr. at 5.[1] American Express informed the Secret Service that it had narrowed the point of compromise to the defendant, a waitress at Harpoon Hanna's. *Id.* The Secret Service learned from American Express, and later from Harpoon Hanna's employees, that the restaurant assigned each server a number, in part to track server tips connected to credit card charges, and that the defendant's server number was associated with most of the allegedly compromised accounts. *Id.* at 5, 7-8. The defendant's employee number was associated with 99% of the compromised accounts. *Id.* at 5.

After learning this information, Secret Service Special Agent Michael Armstrong contacted United States Immigration and Customs Enforcement to determine the defendant's immigration status. *Id.* at 6. Special Agent Armstrong learned that the defendant entered the United States in New York in May, 2004, on a student work visa. *Id.* Thus, she was in the United States for about eighteen months prior to her interview with the Secret Service. *Id.* Through investigation, Special Agent Armstrong also learned that the defendant was almost 23 years old. GX 2 at 00268.

On November 16, 2005, Special Agent Michael Armstrong and Special Agent Al Lassiter traveled to Harpoon Hanna's as part of the investigation. Tr. at 6. The agents arrived about 11:00 a.m.; the restaurant was not open for business at this time. *Id.* at 8. There were other employees present. *Id.* After arrival, the agents first met with Harpoon Hanna's management where they learned that the defendant had started her employment as a waitress in May, 2005, or about six months before the interview. *Id.* at 7.

---

[1] Transcript ("Tr.") of the May 9, 2007 suppression hearing. D.I. 34.

Following this meeting, management brought the defendant to the agents. *Id.* at 9. The agents sat down in a booth -- with the defendant on one side and the agents on the other -- in the public dining area of the restaurant. *Id.* at 10. The agents, who were in plain clothes, identified themselves. *Id.* at 9. Although they were armed, they did not display their weapons. *Id.* They did not frisk the defendant. *Id.* They did not place the defendant in handcuffs. *Id.* at 10.

The agents began by asking some biographical information. The defendant confirmed that she entered the United States in May, 2004, and that she lived in Maryland. *Id.* at 11. Following these introductory questions, and a brief explanation of the purpose of the interview, Special Agent Armstrong advised the defendant of her *Miranda* rights from a pre-printed form. *Id.* at 12-13. GX 1. Special Agent Armstrong read the defendant her *Miranda* rights from the top half of GX 1. Tr. at 15. The defendant was also given time to read the form, and appeared to do so. *Id.* at 16. The defendant than signed below the printed advice of rights, and recorded the date and time. *Id.* at 15-16; GX 1.

Special Agent Armstrong next asked the defendant to read the waiver section of GX 1. The waiver reads:

> I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or force of any kind has been used against me. I hereby voluntarily and intentionally waive my right to remain silent and my right to have an attorney at this time. I am willing to make a statement and answer questions.

GX 1. The defendant appeared to read the waiver. Tr. at 17. She also signed GX 1 below the waiver. Special Agent Armstrong asked the defendant if she wished to speak to the agents. The defendant said yes. Tr. at 16, 17. Special Agent Armstrong also signed the certification section of GX 1, and the defendant signed as a witness. GX 1; Tr. at 17-18.

Following the execution of the *Miranda* waiver, the defendant stated, in essence, and among other things, that she had been asked by another person to obtain credit card numbers, that the person had provided her with a device to capture credit card numbers, and that she had used the device about fifty times. GX 2 at 00266. The defendant also said that she had traveled to New York to meet with the person who had provided the device, and that she had observed the person download information from the device. *Id.*

After making an oral statement, the defendant was asked to make a written statement, which she did. *Id.* at 21. GX 3. The agents walked about 35-40 feet away from the defendant while she was writing. *Id.* at 23. They did not speak to her while she was writing. *Id.* The statement is written in English, is articulate, and, for the most part, grammatically correct. GX 3.

The interview lasted between an hour and an hour and fifteen minutes. *Id.* at 12. The agents and the defendant maintained a conversational tone throughout. *Id.* at 11-12. The defendant did not appear to be under the influence of alcohol or drugs, and did not appear to suffer from any physical or mental disability. *Id.* The defendant, a native of Belarus, *id.* at 18, spoke English throughout the interview. *Id.* Special Agent Armstrong described her ability to communicate in English as very good. *Id.*[2] During the interview, the agents did not threaten the defendant, or make her any promises about how she would be treated. *Id.* at 25-26. She did not ask to take any breaks, but would have been allowed to do so if she had asked. *Id.* at 25.

During the interview, the defendant was asked to sign a form giving consent to search her car. GX 4.[3] SA Armstrong explained that he was seeking her consent to search her car, and that

---

[2] At the hearing on May 9, 2007, the defendant did not appear to rely on an interpreter, although one was present. *Id.* at 18-19.

[3] During the interview, the defendant was also asked by Special Agent Lassiter if he could look through her cell phone. Tr. at 64-66. Special Agent Armstrong testified that the defendant agreed to the request and gave the phone

4

she had the right to refuse. Tr. at 27. The defendant agreed to the search and signed the form. *Id.* at 27; GX 4. After she signed the consent, the defendant accompanied the agents to her car in the parking lot. *Id.* at 28.[4] She was not restrained in any way while walking to the car. *Id.* While outside, the defendant asked to go back into the restroom to retrieve her coat and use the restroom. *Id.* Special Agent Armstrong said "Okay" and then followed her in, about five feet behind. *Id.* at 28-29. Special Agent Armstrong followed her so he would know "when she came out." *Id.* at 62. The defendant went to the restaurant coat closet to get her coat – she did not use the bathroom. *Id.* at 29.

While inside the restaurant, two employees of the restaurant advised Special Agent Armstrong that the defendant had placed an object on the shelf of the coat closet. *Id.* at 29-30. This object proved to be a credit card "skimmer;" an electronic device capable of capturing credit card information. *Id.* at 30. The agents determined to leave the skimmer on the shelf for a period of time to see if the defendant would recover it. *Id.* at 31. Because the defendant made no effort to retrieve the skimmer, the agents recovered it before leaving the restaurant. *Id.* at 33.

Following this episode, the agents also asked the defendant to sign another consent form to search her residence in Ocean City, Maryland. GX 5. Specifically, Special Agent Armstrong asked "if she would mind" if the agents searched the residence; the defendant agreed. Tr. at 62. Special Agent Lassiter asked if he could ride in the defendant's car with her on the trip to the residence; the defendant agreed to that as well. *Id.* at 63. The defendant then drove with Special Agent Lassiter to her residence to execute the consent search. *Id.* at 34. Special Agent Armstrong followed in the agents' car. *Id.*

---

to Special Agent Lassiter. *Id.*
[4] Nothing was seized from the car. *Id.* at 34.

After they arrived in Ocean City, the agents conducted the consent search of the defendant's residence. The defendant's boyfriend, Tigran Melkumyan, was present at the residence and also signed the consent. *Id.* at 32. The agents seized two computers from the residence. When the agents finished the search, they left. *Id.* at 35. The defendant was not arrested. *Id.*

On November 18, 2005, the defendant traveled to the Wilmington office of the Secret Service. *Id.* at 35. She did so at the request of the agents; she was seeking the return of the seized computers and her cell phone. *Id.* at 35, 66-67, 69. She was interviewed by Special Agent Armstrong and Special Agent Michelle Moorhead of the Secret Service's Baltimore office. *Id.* at 36, 40. The defendant was again advised of her *Miranda* rights using a pre-printed form as described above. *Id.* at 37; GX 6. The defendant again waived her rights and agreed to speak. Tr. at 37; GX 6. Special Agent Armstrong confronted the defendant about the skimmer; the defendant admitted to placing it on the shelf of the coat closet. GX 2 at 00267. The defendant also stated, in essence and among other things, that there were forty-four numbers on the skimmer, and that she had been paid $500 for the credit card numbers that she had delivered to the person who gave her the skimmer. *Id.* After making an oral statement, the defendant was asked to make a written statement, which she did. GX 7. The statement is written in English, is articulate, and, for the most part, grammatically correct. GX 7. As with the November 16 interview, the interview lasted about an hour, the defendant did not appear to be under the influence of alcohol or drugs, and did not appear to suffer from any physical or mental disability. The agents did not threaten the defendant, or make her any promises about how she would be treated. The defendant did not ask to take any breaks, but would have been allowed to do so had she asked. *Id.* at 41-42.

6

At the conclusion of the interview, the defendant was arrested. *Id.* at 42.

## ARGUMENT

### I. The Defendant's Statements Were Not Taken in Violation of Any Constitutional Right

#### A. The Interviews Were Non-Custodial

##### 1. Legal Standard for Determining Whether an Interrogation is Custodial

Where the defendant challenges the validity of a *Miranda* waiver and the admissibility of subsequent statements, the government bears the burden of proving by a preponderance of the evidence that the statements at issue were not the product of custodial interrogation conducted in the absence of *Miranda* warnings. *Miranda v. Arizona*, 384 U.S. 444 (1966), *Colorado v. Connelly*, 479 U.S. 157, 168-69 (1986). The question of custody involves the assessment of the following issues: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt she was not at liberty to terminate the interrogation and leave. After it has heard the relevant facts, the Court must then apply an objective test to resolve "the ultimate inquiry: was there a formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest. *Thompson v. Keohane*, 516 U.S. 99, 112 (1995); *Yarborough v. Alvarado*, 541 US 652, 662-63 (2004); *United States v. Jacobs*, 431 F.3d 99 (3d Cir. 2005).

In *Jacobs*, the Third Circuit summarized the law as three differently worded tests:

> (1) when the person has been deprived of her or his freedom in some significant way; (2) when a reasonable person would perceive that she or he was not at liberty to terminate the interrogation and leave; and (3) when there is a restraint on the person's freedom of movement of the degree associated with a formal arrest.

*Jacobs*, 431 F.3d at 105. Among the factors to weigh in assessing whether an individual is in custody are the location of the questioning, the information known to the officer

7

concerning the suspect's culpability, and whether the officer revealed his belief about guilt to the defendant. *Id. See also United States v. Willaman*, 437 F.3d 354, 360 (3d Cir. 2006) (noting that questioning a defendant on "his own turf" not indicative of custodial interrogation) (citation omitted); *United States v. Walton*, 10 F.3d 1024, 1028 (3d Cir. 1993) (finding meeting in public park with full freedom of movement non-custodial). Other factors include whether the defendant came to the interview voluntarily, whether the defendant was told she was under arrest, and whether the defendant was allowed to leave the interview. *See Oregon v. Matthiason*, 429 U.S. 492, 495 (1977); *Jacobs*, 431 F.3d at 106-07. The Third Circuit stated that it regarded this last *Matthiason* factor as the "weakest" because allowing a defendant to leave at the end of the interview is not dispositive of whether a reasonable person would have believed that she could leave during the interview. *Jacobs*, 431 F.3d at 107. Courts have also examined the demeanor and tone of the interview. *See United States v. Jacobs*, 312 F.Supp 2d 619, 628 (D.Del. 2004) (*reversed* on other grounds).

### 2.     The November 16, 2005 Interview Was Non-Custodial

The November 16, 2005, interview took place in a public setting in the middle of the day. Upon first encountering the defendant, the plain-clothes agents did not display their firearms, or frisk the defendant. They conducted the interview from the opposite side of the table (as opposed to, for example, one agent "hemming in" the defendant by sitting between her and the exit to the booth). Although Special Agent Armstrong suspected the defendant was guilty, and indicated that to her, the demeanor and tone of all parties was conversational throughout. Special Agent Armstrong testified that the defendant did not ask to take breaks or ask for any amenities, but he would have agreed to such requests if she had asked. After she agreed to make a written

statement, the agents moved away from the defendant while she was writing. Later, the defendant was able to leave the search of the car to get her coat and use the restroom. Tellingly, she considered herself sufficiently free from restraint and observation that she felt she had time to abandon the skimmer in the coat room closet. When the agents went to search the Maryland residence, the defendant drove her own car to the residence. Special Agent Lassiter accompanied the defendant in the car, but only after he asked if that was acceptable. Finally, the defendant was not arrested after the search of the residence.[5]

In sum, the public setting (a restaurant as opposed to a police station), the defendant's voluntary appearance, the freedom of movement the defendant had during the entire encounter (including the lack of physical restraints, being left alone to write her statement, her walking back to the restaurant from the search of the car without a close escort, and driving her own car to the search of the residence), the conversational demeanor and tone of the entire encounter, and the fact that she was not in fact arrested all weigh heavily in favor of the conclusion that she was not in custody when she was interrogated.

### 3.  The November 18, 2005 Interview Was Non-Custodial

Although a closer question, the Court should also find that the November 18, 2005, interview was non-custodial. The defendant traveled to the Wilmington office of the Secret Service voluntarily. She was searched upon arrival because she was entering the office space, but otherwise was not restrained. Tr. at 43. She did not ask for breaks or other amenities; but Special Agent Armstrong testified that he would have agreed to any such request. Finally, she was not arrested until after the interview concluded. In addition, Special Agent Armstrong

---

[5] Although these last facts concern post-interview events, they are relevant to ascertaining whether the defendant was restrained to the degree associated with formal arrest. A person under arrest is not permitted to drive her own car,

9

testified that she cried when he told her she was under arrest, but that she had not cried before that time, Tr. at 70; this fact tends to show that she did not consider herself under arrest prior to the time Special Agent Armstrong informed her that she now was under arrest. Under these circumstances, the Court should not find that there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.

### B. The Defendant Was Advised Of, And Waived, Her *Miranda* Rights

#### 1. Legal Standard For Assessing The Validity Of A *Miranda* Waiver

Assuming a custodial interrogation, whether the defendant's waiver of her *Miranda* rights is valid should be assessed in light of the "totality of the circumstances surrounding the waiver." *United States v. Smith*, 679 F. Supp. 410, 412 (D.Del.1988) (citation omitted). When analyzing the totality of the circumstances, this Court must look at the facts of the particular case, including the background, experience, and conduct of the suspect. *See United States v. Sriyuth*, 98 F.3d 739, 748-49 (3d Cir. 1996).

The Court must consider two factors to determine whether the defendant's waiver was voluntary, knowing and intelligent:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*United States v. Durham*, 741 F. Supp. 498, 502 (D.Del. 1990) (citation and emphasis omitted).

---

and is not typically let go after the questioning concludes.

### 2. The Defendant Waived Her *Miranda* Rights At Both Interviews

The defendant lived in the United States for about eighteen months prior to her arrest. She was employed for about six months in a customer service job. Both of these facts tend to show facility in English. In addition, she communicated at length with the agents in English (and without switching to Russian), she wrote articulate statements in English, and she sat through the suppression hearing without resorting (to the government's knowledge) to an interpreter, although one was present. This record compels the conclusion that language was not a barrier to the defendant's comprehension of the rights she chose to abandon.

At the November 16, 2005, interview, the agents provided the *Miranda* rights on a preprinted form. Special Agent Armstrong read the rights to her. The form accurately characterized the *Miranda* rights, and was written in easy to understand English. In addition, the defendant was afforded a chance to read the form for herself, which she appeared to do, and which she then signed, acknowledging that she both read the rights portion of the form and had it read to her. She was also afforded a chance to read the waiver section of the form, which she appeared to do. The waiver section explained in plain English that by signing, she was saying that she did not want a lawyer, that she understood what she was doing, that she had not received any promises or threats and that she waived her right to remain silent and to speak to an attorney. The defendant signed the form, acknowledging that she understood what she was abandoning. In addition, Special Agent Armstrong affirmatively asked her if she wanted to speak to the agents, and she said that she did. The record described above is clear that the defendant understood her rights, understood what she was surrendering by waiving those rights, and that her decision was not influenced by any threats or promises, and that her will was not overborne in any way.

At the November 18, 2005, interview, the defendant voluntarily appeared, although two days had passed, and the defendant knew from the prior encounter that she was being investigated for a crime. Special Agent Armstrong again advised her of her *Miranda* rights, and allowed her to read those rights for herself. He also gave her time to read the waiver section explaining what rights she was surrendering by answering questions. The defendant again signed the form acknowledging that she had read the *Miranda* rights section, and that it was read to her. She also signed acknowledging her waiver of her rights. Special Agent Armstrong again asked her affirmatively if she wanted to speak, and the defendant again said she wanted to speak. The record described above is clear that the defendant understood her rights, understood what she was surrendering by waiving those rights, and that her decision was not influenced by any threats or promises, and that her will was not overborne in any way.

In sum, the record is clear from the totality of the circumstances that the defendant was properly advised of her rights, and her waiver of those rights was the product of a free and deliberate choice. The record is also clear that the waiver was made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Because the government has demonstrated by a preponderance of the evidence that the defendant's statements were not taken in violation of her *Miranda* rights, they should not be suppressed.

**II.    No Physical Evidence Was Obtained in Violation of Any Constitutional Right**

At the hearing, Special Agent Armstrong testified that he seized three pieces of physical evidence – the credit card skimmer from the restaurant coat closet, the two computers from the defendant's residence, and the defendant's cell phone.

### A.     The Skimmer Was Lawfully Obtained

When a person abandons property, she forfeits her privacy interest in that property. *See United States v. Fulani*, 368 F.3d 351, 354 (3d Cir. 2005) (citations omitted). Abandonment for purposes of the Fourth Amendment requires an examination of the individual's reasonable expectation of privacy, not her property interest in the item. *See id*. "A court must determine from an objective viewpoint whether property has been abandoned. Proof of intent to abandon property must be established by clear and unequivocal evidence." *Id*. The facts described above, demonstrate that the defendant abandoned the skimmer when she voluntarily placed the skimmer on the shelf of the restaurant's coat closet, a place where she had no reasonable expectation of privacy. She made no effort to recover it while still in the restaurant, and never gave any indication that it was hers until two days later when confronted with it by the agents. Thus, the seizure of the skimmer, and the subsequent search of its contents, did not violate any Constitutional right held by the defendant.

### B.     The Computers and the Cell Phone Were Lawfully Obtained

The Supreme Court has held that a warrantless search is justified by a valid consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). The consent must be voluntarily made, and the person giving consent to search must have the authority to do so. *United States v. Matlock*, 415 U.S. 164, 171 (1974). In *Schneckloth* the Supreme Court stated that voluntariness "is a question of fact to be determined from the totality of all of the circumstances." *Schneckloth*, 412 U.S. at 227. The "critical factors comprising a totality of the circumstances inquiry" include the "setting in which the consent was obtained, the parties' verbal and non-verbal actions, and the age, intelligence, and educational background of the consenting individual." *United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003). The facts described above, concerning the location of

13

the interview, the tone of the encounter, the defendant's freedom of movement during the encounter, as well as her evident maturity at being able to function for eighteen months in a foreign environment and maintain employment for the six months preceding the encounter, and her obvious intelligence reflected in her written statements clearly establish that the written consents to search the car and the residence and her verbal consent to search the cell phone were voluntarily given. Accordingly, any evidence obtained from these searches should not be suppressed.

      WHEREFORE, the government respectfully asks that the Court deny the pending motion.

      Respectfully submitted,

      COLM F. CONNOLLY
      United States Attorney

By: _____
      Douglas E. McCann
      Assistant United States Attorney
      1007 Orange Street, Suite 700
      P.O. Box 2046
      Wilmington, DE 19899
      (302) 573-6277

Dated: May 25, 2007

## **CERTIFICATE OF SERVICE**

I, Douglas E. McCann, hereby certify that on May 25, 2007, I served the foregoing:

**GOVERNMENT'S POST-HEARING RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS STATEMENTS AND PHYSICAL EVIDENCE**

by CM/ECF on

        Christopher Koyste, Esquire
        First Federal Plaza
        704 King Street, Suite 110
        Wilmington, Delaware 19801

        /s/ Douglas E. McCann
        Douglas E. McCann