IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : |
|     Plaintiff, | : |
| | : |
|   v. | : Criminal Action No. 05-111-JJF |
| | : |
| KATSIARYNA KABIARETS, | : |
| | : |
|     Defendant. | : |

Colm. F. Connolly, Esquire, United States Attorney, and Douglas E. McCann, Esquire, Assistant United States Attorney, UNITED STATES ATTORNEY'S OFFICE, DISTRICT OF DELAWARE, Wilmington, Delaware.

Attorneys for Plaintiff.

Eleni Kousoulis, Esquire, FEDERAL PUBLIC DEFENDER'S OFFICE, Wilmington, Delaware.

Attorney for Defendant.

**MEMORANDUM OPINION**

July 10, 2007
Wilmington, Delaware

Farnan, District Judge

Pending before the Court is Defendant's Motion To Suppress Statements And Physical Evidence (D.I. 15). For the reasons discussed below, the Motion will be denied.

I.   BACKGROUND

On December 15, 2005, Defendant Katsiaryna Kabiarets was indicted for conspiracy to commit credit card fraud, in violation of 18 U.S.C. § 1028(b), aggravated identity theft, in violation of 18 U.S.C. § 1028A, and identity theft, in violation of 18 U.S.C. § 1028(a)(7). On March 17, 2006, Ms. Kabiarets filed the instant Motion To Suppress.

By her Motion, Ms. Kabiarets contends that she was subject to two custodial interrogations during which her statements were obtained in violation of her Fifth Amendment rights. Accordingly, Ms. Kabiarets moves to suppress both the statements and all physical evidence obtained after the statements were made.

On May 9, 2007, the Court held a hearing on the Motion To Suppress. At the hearing, Special Agent Michael Armstrong for the United States Secret Service testified. Following the hearing, the parties submitted supplemental briefs setting forth their positions on the evidentiary record established at the hearing. This Memorandum Opinion sets forth the Court's findings of fact and conclusions of law.

II. **FINDINGS OF FACT**

1. In November 2005, American Express contacted Agent Armstrong about compromised credit cards traced to Harpoon Hanna's restaurant in Fenwick Island, Delaware. American Express explained that 99% of the compromised numbers were traced to an employee number assigned to Ms. Kabiarets. (Tr. at 4-5)[1]

2. After receiving the information from American Express, Agent Armstrong contacted Immigration and Customs Enforcement to inquire about Ms. Kabiarets' immigration status and learned that she had entered the United States on a visa in May 2004. (Tr. at 6)

3. On November 16, 2005, Agent Armstrong and Special Agent Lassiter traveled to Harpoon Hanna's restaurant and arrived around 11:00 a.m., before the restaurant opened for business. Approximately 10 to 15 employees were present including a manager. Upon arrival, the Agents learned from a member of the management team that the restaurant had been contacted by American Express regarding the compromised credit cards. The Agents learned from the manager that Ms. Kabiarets was employed as a waitress since May 2005 and that each employee was assigned an employee number. (Tr. at 8)

---

[1] Transcript of the May 9, 2007, Suppression Hearing (D.I. 34). Unless otherwise noted, transcript citations at the end of a numbered paragraph are for the entire numbered paragraph.

4. The manager introduced the Agents to Ms. Kabiarets and the group proceeded to a corner booth in an out-of-the-way area of the restaurant. The Agents sat across the table from Ms. Kabiarets. The Agents wore plain clothes and, although armed, did not display their firearms during the interview. (Tr. at 9-10)

5. Once seated, the Agents introduced themselves to Ms. Kabiarets as Secret Service Agents and displayed their credentials. The Agents asked Ms. Kabiarets questions about her biographical information including when she arrived in the United States, where she lived and how long she had been in the U.S. The Agents explained that they were investigating credit card compromises at Harpoon Hanna's and that 99% of the compromises were traced to her employee number. (Tr. at 12)

6. The Agents then administered to Ms. Kabiarets the three-part Secret Service Warning And Consent To Speak Form. (GX-1). The first part is a printed statement of the <u>Miranda</u> rights.[2]

---

[2] The "Warning Of Rights" section of the form reads: "You must understand your rights before we ask you any questions. You have the right to remain silent. Anything you say can be used against you in court, or other proceedings. You have the right to talk to a lawyer for advice before we question you and to have him with you during questioning. If you cannot afford a lawyer and want one, a lawyer will be appointed for you by the court. If you decide to answer questions now without a lawyer present, you will still have the right to stop the questioning at any time. You also have the right to stop the questioning at any time until you talk to a lawyer. I have read this statement of my rights an it has been read to me, and I understand what my rights are." (GX-1).

3

Agent Armstrong read verbatim the Miranda rights and Ms. Kabiarets dated and signed the form in the appropriate place to affirm that the rights were read to her. (Tr. at 15). Agent Armstrong then handed the form to Ms. Kabiarets and instructed her to read the statement of the rights, which she appeared to do. (Tr. at 16). The second part of the form is the Miranda waiver.[3] Agent Armstrong explained the waiver to Ms. Kabiarets, gave it to her to read, then asked if she was willing to speak with them and answer questions. Ms. Kabiarets responded in the affirmative and signed the waiver. The third part of the form is a certification to affirm that the Agent read the form. This section was signed by Agent Armstrong and Ms. Kabiarets. (Tr. at 16-17)

7. The Agents then asked Ms. Kabiarets questions regarding the credit cards. Ms. Kabiarets' oral statements were summarized by Agent Armstrong in a written report based on his recollection of the conversation and notes taken during the interview. (Tr. at 20, GX-2).

8. The interview lasted approximately one hour and was conducted in English. (Tr. at 17). Ms. Kabiarets exhibited a

---

[3] The "Waiver" section of the form reads:
"I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or force of any kind has been used against me. I hereby voluntarily and intentionally waive my right to remain silent and my right to have an attorney at this time. I am willing to make a statement and answer questions."

4

casual and conversational demeanor and tone throughout the interview. (Tr. at 12). Ms. Kabiarets did not ask for a break. The Agents did not threaten or make any promises to Ms. Kabiarets. The Agents did not discuss a particular criminal code or punishment. (Tr. at 25)

    9. After giving an oral statement, the Agents asked Ms. Kabiarets to provide a written statement. Ms. Kabiarets agreed and was given a Secret Service Statement Form on which to write her statement. (GX-3). While Ms. Kabiarets wrote her statement, the Agents left her alone at the booth and walked toward the front door of the restaurant, approximately 35-40 feet away. Ms. Kabiarets dated and initialed her statement and signed the form. Agent Lassiter also dated and initialed her statement. In addition, Agent Armstrong signed the form. (Tr. at 23-24)

    10. Approximately halfway through the interview, Agent Lassiter asked Ms. Kabiarets' permission to look through her cell phone. Ms. Kabiarets agreed and handed the cell phone to Agent Lassiter. The Agents maintained possession of the cell phone as evidence. (Tr. at 65-66)

    11. After Ms. Kabiarets finished writing her statement, the Agents asked for her consent to search her vehicle, located in Harpoon Hanna's parking lot. The Agents gave Ms. Kabiarets a Secret Service Consent To Search Form. (GX-4). Agent Armstrong explained the form to Ms. Kabiarets and told her she had to right

5

to refuse the search. Ms. Kabiarets consented to the search of her vehicle and signed the form. (Tr. at 27.)

12. After obtaining Ms. Kabiarets' consent to search the vehicle, the Agents and Ms. Kabiarets walked outside to the vehicle. No evidence was retrieved from the car. (Tr. at 28)

13. While the Agents searched the vehicle, Ms. Kabiarets asked to go inside to get her coat and use the restroom. (Tr. at 28). Agent Armstrong followed Ms. Kabiarets into the restaurant and waited at the front of the restaurant while Ms. Kabiarets proceeded to the back of the restaurant to the restroom. While waiting, the manager and a server informed Agent Armstrong that the server had seen Ms. Kabiarets take something out of her pocket and place it on the shelf of the coat closet. (Tr. at 29). Agent Armstrong testified that the object from the coat closet was handed to him by the server.[4] Agent Armstrong identified the object as a credit card skimmer and placed it back in the coat closet to see whether Ms. Kabiarets would return to retrieve it. (Tr. at 30-31). Before leaving the restaurant, the Agents retrieved the skimmer. (Tr. at 33)

14. After searching the vehicle, the Agents obtained Ms. Kabiarets' consent to search her residence in Ocean City,

---

[4] In his written report of the investigation, Agent Armstrong recalled that he went to the coat closet to retrieve the object. During direct examination, he testified that the server handed him the skimmer. (Tr. at 30).

6

Maryland. The Agents administered another Secret Service Consent To Search Form which was signed at the restaurant by Ms. Kabiarets. (Tr. at 32-33, GX-5)

15. Agent Armstrong drove the Agents' vehicle to Ms. Kabiarets' residence and Ms. Kabiarets drove her vehicle, accompanied by Agent Lassiter as a passenger. (Tr. at 34)

16. Upon arriving at the residence, the Agents obtained the consent of Ms. Kabiarets' boyfriend, Tigran Melkumyan, to search the residence. The Agents conducted the search in approximately forty-five minutes and seized two computers as evidence. The Agents then left the residence and did not arrest Ms. Kabiarets.

17. On November 18, 2005, Ms. Kabiarets arrived at the offices of the Secret Service in Wilmington, Delaware.[5] She was frisked upon arrival pursuant to office policy. (Tr. at 43)

18. At the office, Agent Armstrong and Special Agent Michele Moorehead took Ms. Kabiarets to a conference room for an interview. Agent Armstrong advised Ms. Kabiarets of the _Miranda_ rights via the same three-part Secret Service Warning And Consent To Speak Form that Ms. Kabiarets had read and signed at Harpoon Hanna's on November 16, 2005. (GX-6). Agent Armstrong read the _Miranda_ rights, asked Ms. Kabiarets whether she understood, and

---

[5] On direct examination, Agent Armstrong testified that Ms. Kabiarets came to the office in order to recover the seized computers. On cross-examination, Agent Armstrong could not testify with certainty whether Ms. Kabiarets was told the purpose of the Agents' request that she come to the office. (Tr. at 35).

allowed Ms. Kabiarets to read the form.  Ms. Kabiarets answered that she understood the form, read and signed the form, and agreed to speak with the Agents.  Agent Armstrong then re-interviewed Ms. Kabiarets.  (Tr. at 37, 40).

   19.  During the interview, Ms. Kabiarets made oral statements which were summarized by Agent Armstrong in his investigation report (GX-2).  Ms. Kabiarets also made a written statement on a Secret Service Statement Form, similar to the form on which she made a written statement on November 16, 2005. (GX-7).  This form was signed and dated by Ms. Kabiarets, Agent Armstrong, and Agent Moorehead.  (Tr. at 38-40)

   20.  The interview lasted approximately one hour.  During the interview, Agent Armstrong did not make any threats or promises.  Ms. Kabiarets was not restrained, did not request breaks, did not appear to be under the influence of alcohol or drugs, or be subject to a physical or mental disability.  Ms. Kabiarets maintained a casual demeanor and did not appear nervous. (Tr. at 41-42)

   21.  After Ms. Kabiarets gave her written statement, Agent Armstrong placed her under arrest. (Tr. at 42)

**III. CONCLUSIONS OF LAW**

   1.  The Fifth Amendment to the United States Constitution (the "Fifth Amendment") provides that "no person. . . shall be compelled in any criminal case to be a witness against himself. .

. ." The Supreme Court, in <u>Miranda v. Arizona</u>, 384 U.S. 436, 444-45 (1966) held that:

> the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform the accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.

<u>Id</u>.

3. It is well-settled that a defendant can waive his or her <u>Miranda</u> rights if the waiver is made knowingly, intelligently and voluntarily. See <u>United States v. Palmer</u>, 203 F.3d 55, 60 (3d Cir. 2000). It is the Government's burden, in accord with <u>Miranda</u> and its progeny, to establish that a waiver of rights was both voluntary, knowing and intelligent. First, the statements must be given voluntarily in the sense that it was the product of a free and deliberate choice rather than the result of intimidation, coercion or deception. Second, the waiver must be

9

knowing and intelligent in the sense that it is made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

4. The Constitution does not require that a suspect know and understand every possible consequence of the waiver of his Miranda rights. Colorado v. Spring, 479 U.S. 564 (1987). Rather, a defendant must be informed of the "pertinent consequence" that the Government will use the information provided by him in order to secure a conviction. Miranda, 384 U.S. at 469.

5. To assess the validity of a waiver, it is necessary to look at the totality of the circumstances. Arizona v. Fulminante, 499 U.S. 279 (1991). A court should look to the particular facts of a given case, including the defendant's background experience and conduct. United States v. Velasquez, 885 F.2d 1076, 1086 (3d Cir. 1989).

6. An express written statement of a waiver is strong proof as to the validity of a waiver. A waiver may also be made orally or implied from the defendant's conduct. North Carolina v. Butler, 441 U.S. 369, 373 (1979).

7. The Government must prove the waiver of a Defendant's Miranda rights by a preponderance of the evidence. See Colorado v. Connelly, 479 U.S. 157, 168 (1986).

**NOVEMBER 16, 2005 STATEMENT**

    8. With respect to the November 16, 2005, statement of the Defendant, made at Harpoon Hanna's, the Court concludes that the Government has met its burden of demonstrating compliance with Miranda and its progeny.[6] The evidence demonstrates that, after introducing themselves and explaining their purpose, Agents Armstrong and Lassiter read Defendant the Miranda warnings prior to questioning. Specifically, the evidence establishes that Agent Armstrong read the Miranda warnings verbatim from the Secret Service Warning And Consent To Speak Form, then instructed the Defendant to read the warnings to herself which she did. After advising the Defendant of the warnings, Agent Armstrong explained the Miranda waiver to Defendant and asked Defendant whether she was willing to answer questions, to which she replied "yes." That Ms. Kabiarets was a waitress at a restaurant for approximately six months and was able to communicate with the Agents via oral and written statements demonstrates that Ms. Kabiarets was sufficiently proficient in the English language to understand what was occurring. Therefore, the Court concludes that the Defendant knowingly and intelligently waived her Miranda rights.

---

[6] The Government contends that Defendant was not in custody during the November 16 interview. For the purposes of this Motion, the Court concludes that Defendant was in custody during the interview.

11

9. The Court further concludes that the Defendant's waiver of her rights was voluntary. Defendant contends that the Agents questioned her first and then gave the <u>Miranda</u> warnings "mid-stream to effectuate a waiver of rights," undermining the voluntary nature of Defendant's statements. However, based on the evidence before it, the Court finds no support for Defendant's contention. There is no evidence of police coercion, deception, or intimidation. The evidence establishes that, prior to reading to Defendant the <u>Miranda</u> warnings, the Agents clearly identified themselves and stated their purpose for speaking with Defendant. Additionally, prior to any questioning, Agent Armstrong testified that he did not make promises to Defendant regarding possible charges. Thus, the Court concludes that the Defendant knowingly and voluntarily waived her rights at the November 16, 2005, interview, and accordingly, the Motion as it pertains to the November 16, 2005 statement will be denied.

**NOVEMBER 18, 2005 STATEMENT**

10. With respect to the November 18, 2005 statement made at the Secret Services offices, the Court concludes that the Government has met its burden of demonstrating compliance with <u>Miranda</u> and its progeny.[7] The evidence establishes that, prior

---

[7] The Government contends that Defendant was not in custody during the November 18 interview. For the purposes of this Motion, the Court concludes that Defendant was in custody during the interview.

to questioning Ms. Kabiarets, Agent Armstrong read to her the Miranda warnings from the Secret Service Warning And Consent To Speak Form, then instructed the Defendant to read the warnings to herself. After reading the warnings, Agent Armstrong explained the Miranda waiver to Defendant and asked Defendant whether she was willing to answer questions, to which she replied "yes." Ms. Kabiarets then made an oral and a written statement. The Court concludes that the Defendant knowingly and intelligently waived her Miranda rights.

    11. The Court also concludes that the Defendant's waiver of her rights was voluntary. The Defendant contends, as she did with respect to the November 16 statement, that the Agents questioned her first and then advised her of the Miranda warnings "mid-stream to effectuate a waiver of rights," undermining the voluntary nature of the statements. The Court finds there is no evidence that supports this contention. The evidence establishes that the Defendant appeared voluntarily at the offices of the Secret Service. Prior to reading the Miranda warnings to the Defendant, Agent Armstrong and Agent Moorehead identified themselves and made no promises about cooperation or prosecution. Further, the Court finds the following facts support a finding of voluntariness: the interview lasted approximately one hour; the Defendant was not restrained or handcuffed; and, Agent Armstrong asked Defendant whether she was willing to answer questions to

which she replied in the affirmative. Accordingly, the Court concludes the Motion as it pertains to the November 18, 2005 statement will be denied.

**PHYSICAL EVIDENCE**

12. The Fourth Amendment to the United States Constitution protects "the right of the people to be secure against unreasonable searches and seizures. . .."

13. Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause, unless it falls under an exception to the warrant requirement. Evidence derived from constitutional violations may not be used at trial because illegally derived evidence is considered "fruit of the poisonous tree." Wong Sun v. United States, 371 U.S. 471, 487-88 (1963).

14. Where a search is conducted without a warrant, the burden is on the Government to demonstrate by a preponderance of the evidence that the search was conducted pursuant to one of the exceptions to the warrant requirement." See United States v. Herrold, 962 F.2d 1131, 1137 (3d Cir. 1992).

15. The Government may conduct a warrantless search of property if they obtain the voluntary consent of the individual whose property is to be searched or a third party with common authority or joint control over the premises.

16. Police may search abandoned property without a warrant because the individual has forfeited his or her reasonable expectation of privacy. United States v. Fulani, 368 F.3d 351, 354 (3d Cir. 2004). The courts must determine whether an individual has a reasonable expectation of privacy by using an objective standard. Id. The intent to abandon must be established by clear and unequivocal evidence. Id.

17. In the circumstances of this case, the Court concludes that the Government has met its burden to prove by a preponderance of the evidence that the physical evidence was not obtained in violation of Defendant's Fourth Amendment rights. Also, because the Court concludes that there is no constitutional violation related to Ms. Kabiarets' statements, the physical evidence obtained by the Agents as a result of these statements is admissible and not precluded by the "poisonous tree" doctrine.

18. Additionally, the Court concludes that Ms. Kabiarets voluntarily consented to a search of her vehicle and she and Mr. Melkumyan voluntarily consented to a search of their residence in Ocean City, Maryland from which the computers were seized. The evidence indicates that, with respect to both properties, Ms. Kabiarets read, understood, and signed a consent form to allow the searches. Therefore, the Court concludes that, in these circumstances, a warrantless search of Defendant's property did not violate Ms. Kabiarets' Fourth Amendment rights.

19.  The Court further concludes that the seizures of Ms. Kabiarets' cell phone and the credit card skimmer were not in violation of Defendant's constitutional rights.  The evidence demonstrates that Ms. Kabiarets voluntarily handed her cell phone to Agent Lassiter after being informed that she was the subject of an investigation.  The evidence also demonstrates that Ms. Kabiarets voluntarily placed the skimmer in the public coat closet of the restaurant and did not attempt to retrieve it before leaving the restaurant.  Based on this evidence, the Court concludes that a reasonable person could not have any expectation of privacy with respect to the cell phone and skimmer.  Accordingly, the Motion To Suppress with respect to the physical evidence seized will be denied.

## IV. CONCLUSION

For the reasons discussed, Defendant's Motion To Suppress Statements And Physical Evidence (D.I. 15) will be denied.

An appropriate Order will be entered.